# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **TRAXYS NORTH AMERICA, LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:10CV00029 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **CONCEPT MINING, INC.,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendant. | ) | |

*Wade W. Massie, Penn, Stuart & Eskridge, Abingdon, Virginia, for Plaintiff;*
*Robert J. Hannen and Dennis J. Buffone, Thorp Reed & Armstrong, LLP,*
*Wheeling, West Virginia, and Howard C. McElroy, McElroy, Hodges, Caldwell &*
*Thiessen, Abingdon, Virginia, for Defendant.*

The defendant in this civil diversity case, Concept Mining, Inc. ("Concept"),

a coal mining company, agreed to sell coal to the plaintiff, Traxys North America,

LLC ("Traxys"), a company in the business of buying and reselling coal. Traxys

contends that Concept breached that agreement, causing Traxys damages based on

a later increase in the price of similar coal. After a two-day bench trial, I set forth

in this Opinion my findings of fact and conclusions of law as required by Federal

Rule of Civil Procedure 52(a)(1). Based on those facts and law, I find in favor of

Traxys and will award it damages in the principal amount of $4,167,760.

A.    FINDINGS OF FACT.

Most of the facts in this case are uncontradicted.  Otherwise, in determining the facts of the case I have taken into account the rationality and internal consistency of the testimony and exhibits, their extent of detail and coherent nature, the manner of testifying by the witnesses, and the degree to which such testimony is consistent or inconsistent with other evidence in the case.

The plaintiff Traxys is a limited liability company incorporated in Delaware. The sole member of Traxys is an entity that is resident in Luxembourg.  Traxys maintains an office and conducts business in New York.  It offers marketing and trading services for various commodities, including metals and coal.  Traxys' trading activities include purchasing, storing, and reselling coal.

The defendant Concept is a corporation engaged in the business of mining and selling coal, incorporated in West Virginia.  Concept operates underground coal mines, producing low-volatile metallurgical coal, a type of coal valued for its use in making steel.

In the fall of 2007, representatives from Traxys and Concept, Janet Billups and Jennifer Austin respectively, began negotiations — primarily by email — for Concept to sell to Traxys over time a quantity of low-volatile metallurgical coal. They eventually signed on behalf of their companies a written agreement dated

December 17, 2007, for the purchase and sale of approximately 4,000 tons of coal per month, at an initial price of $78 per ton, with delivery by Concept into railroad cars at a specified loadout point on the railroad.

The written agreement consisted of a three-page typed document drafted by Traxys' Janet Billups, on Traxys letterhead, entitled "Confirmation Letter," followed by three addenda. The first two addenda contained specifications for the coal in question and the third was a printed form entitled "General Terms and Conditions." The parties agree, and I find, that these writings together constituted the written contract between them in this case. It will hereafter be referred to as "the Contract."

Among other things, the General Terms and Conditions portion of the Contract contained a choice-of-law provision calling for the application of New York law, a state where Traxys has offices. The parties agree that this provision is valid.

Several of the provisions of the "Confirmation Letter" portion of the Contract are pertinent to the present dispute. First, it specified a term from "January 1, 2008 – December 30, 2008." (Ex. 17, Confirmation Letter, p. 1.) [1] It also provided that, "Seller shall notify Buyer of intended delivery schedule no less

---

[1] The parties submitted most of the trial exhibits jointly, which are cited in this Opinion as "Ex." The defendant's separate exhibits are referred to as "Def.'s Ex." Citations to the trial transcript are denoted "Tr."

than three (3) days before the first (1st) day of the month of delivery." (*Id.*)

Finally, and at the center of the present dispute, the Confirmation Letter portion of the Contract had a provision called "Special Provisions," as follows:

> This transaction has an additional two year term that is an integral part of the contract with a $5.00 (Five Dollar) collar for each year. Commencing on November 1, 2008, the Parties shall mutually agree to negotiate in good faith and attempt to agree upon a new Contract to be in effect for Contract Year 2009. Such contract Price negotiations may take into consideration prices at which Seller could sell coal of a similar quality and quantity to any third party(ies) and prices at which Buyer could purchase coal of a similar quality and quantity from any third party(ies). If the Parties cannot agree upon a new Base Price by November 30, 2008 for the January 1, 2009 price reopener and November 30, 2009 for the January 1, 2010 price reopener, and Traxys is unwilling to pay $83.00 per ton fob car as a Base Price and Concept is unwilling to accept $73.00 per ton fob car as a Base Price, then Buyer and Seller agree this Agreement shall terminate on December 31, 2008.

(*Id.*, p. 2.) This provision references a so-called "collar," meaning a method for determining the price per ton after 2008 for the subject coal. It essentially provides for reciprocal options, with the seller (Concept) given the option to sell the coal in 2009 and 2010, provided it does so at the low collar price of $73 per ton and the buyer (Traxys) given the option to purchase the coal in 2009 and 2010, provided it does so at the high collar price of $83 per ton.

Concept began delivering monthly installments of coal in January 2008 pursuant to the Contract. In July 2008, Concept was acquired by ArcelorMittal ("AM"), an international metals and mining company. Although Concept largely

continued to function as an independent corporate entity, certain business and employment positions changed to reflect AM's interests. On the operations side, Jennifer Austin moved from her position in operations to commercial manager. Steve Haynes, another Concept employee, took over operations responsibilities associated with fulfilling contracts. On the business side, purchasing and sales responsibilities were taken over by AM personnel. Responsibility for the Traxys transaction was handed over to Liem Hazoumé, the lead coal buyer for the Americas in AM's Sourcing Group. Hazoumé was located in Luxembourg.

On October 17, 2008, Vice President of Traxys' Carbon Division, Matthew Reed, sent a letter to Jennifer Austin notifying Concept of Traxys' intent to purchase the 2009 tonnage under the Special Provisions provision. The letter, which Concept duly received, provided as follows:

> This letter is to notify you that Traxys North America, LLC, is pleased to purchase the 2009 tonnage at a Base Price of $83.00 under our contract # 7018, dated December 17, 2007, between Concept Mining, Inc. and Traxys North America, LLC.
>
> This Base Price applies to 4,000 tons per month for ratable delivery during 2009, fob NS car at Concept's designated loadout. The quality and other terms and conditions shall remain the same as detailed in Contract # 7018.
>
> Since your company ownership has changed, please forward this notice to any other appropriate persons. . . .

(Ex. 26.)

There was no response by Concept to this letter, although Concept reflected the 2009 obligation in its accounting records. (Tr. 16, 31-32, May 24, 2011, Part 1.)

Concept made monthly deliveries in 2008, and delivered some coal in early 2009, towards deficiencies in the 2008 tonnage. Although the 2009 deliveries were originally billed and paid at $83 per ton, after Traxys challenged the invoice, Concept issued a refund to reflect the $78 price in place throughout 2008.

On March 23, 2009, Carl Billups, Quality Control and Logistics Manager for Traxys, emailed Hazoumé pointing out that Concept was behind in its contractual obligation to supply coal and requesting delivery schedules. (Ex. 35.) Billups followed up on March 27, noting that Traxys was "completely flexible on loading dates each month." (Ex. 36.) Hazoumé replied several days later, assuring Billups that he would get the information from Concept and forward it along to Traxys. (Ex. 44.) Billups informed Hazoumé that all further communications regarding the Contract should be directed to Rod Savage, an employee in Traxys' export division. On April 7, 2009, Hazoumé contacted Savage via email asking him to "discuss" Billups' emails. (Ex. 52.)

Hazoumé's April 7 email was internally forwarded to George Dorsey, a director and shareholder of Traxys, and a manager in Traxys' coal group. Dorsey responded by directing Savage and other Traxys employees to avoid further

communications with Concept and Hazoumé. The so-called "George Strategy" was to keep silent and to avoid responding to Concept. (Exs. 46-48, 53, 58, 60.) Based on his prior experiences, Dorsey believed that AM, Concept's new owner, was an unreliable trading partner. He felt that if Traxys engaged in discussions with AM, AM would use the discussions to seek more favorable terms in their relationship, rather than simply adhering to the Contract.

Moreover, due to a drop in the price of coal in early 2009, the 2009 tonnage was no longer an advantageous purchase for Traxys. For example, there were internal emails by Savage dated in April and May 2009, describing the market for metallurgical coal as "dead" and "nothing but dire." (Exs. 39, 81.) Because Traxys believed Concept was already delinquent on the Contract in early 2009, by remaining silent and allowing Concept to continue in breach, Traxys hoped to avoid taking disadvantageous tonnage in the interim. If the market improved, Traxys would reinitiate communication. (Exs. 68, 84.)

In June of 2009, Savage informed Hazoumé that Traxys' believed Concept was short on its 2008 obligations and was in breach for 2009. (Ex. 99.) Hazoumé responded, "What are you talking about on Concept side? We were in [d]iscussion to extend the contract and you are now tal[k]ing about failure to deliver? I fail to understand the logic." (Ex. 101.)

In sporadic communications through late 2009, both Savage and Hazoumé reiterated their conflicting positions about the status of the Contract, with Savage requesting Concept's performance under the Contract and Hazoumé questioning the existence of any obligation existing after 2008. (Exs. 113-116, 125.) Had Hazoumé agreed on behalf of Concept to perform the Contract, Traxys would have taken all of the coal tonnage promised for both 2009 and 2010, at the price agreed upon by the parties.

Concept never provided delivery schedules in 2009, nor did it deliver any coal to Traxys. In January of 2010, Savage informed Concept that Traxys would still take the balance of the owed tonnage. (Ex. 140.) Even after Traxys forwarded copies of the 2009 election letter and the Contract at Hazoumé's request, Hazoumé continued to maintain that Concept owed Traxys no further tonnage. (Exs. 156-57.) On the other hand, Traxys maintained its position that Concept continued to be bound and that Concept had breached its obligation to deliver coal for 2009. (Ex. 161.) For his part, Hazoumé purported to believe, as he stated as late as a February 10, 2010, email to Savage, "[T]here is a provision in the contract that provides that the 2 companies have to agree on contract extension. As far as I know, such an agreement has never been achieved." (Ex. 157.)

The General Terms and Conditions portion of the Contract contained a provision respecting damages for non-performance. It provided that:

-8-

Unless excused by Force Majeure or Buyer's failure to perform, if Seller fails to deliver all or any part of the quantity of Coal to be delivered under a Transaction, Seller shall pay Buyer for each ton of such deficiency ("Deficiency") an amount equal to the positive difference, if any, obtained by subtracting the Contract Price for the Deficiency from the Replacement Price plus (i) any additional transportation costs incurred by Buyer due to such failure, and (ii) Legal Costs incurred by Buyer. "Replacement Price" means the price, determined by Buyer in a commercially reasonably [sic] manner, at which Buyer timely purchases (if at all) substitute coal in the amount of the Deficiency of the same type and quantity as the coal for the Deficiency or, absent such purchase, the market price for such quantity of Coal FOB Delivery Point.

. . . .

. . . The remedies set forth herein shall be the sole and exclusive remedy of the aggrieved Party for the failure of the other Party to deliver or receive, as the case may be, the quantity of coal specified herein and all other damages and remedies are hereby waived.

(Ex. 17, General Terms and Conditions ¶ 1(a), (d).)

The parties dispute the extent of damages under this provision. At trial, they presented testimony by competing experts. Both experts analyzed the market price of coal on a monthly basis during the relevant period and provided their opinions as to damages. I find, for the reasons stated later in this Opinion, that Traxys' expert was substantially accurate in his opinions as to the amount of damages suffered by Traxys.

In summary, I find as follows:

1.      The Contract bound the parties for 2008 and to reciprocal options to sell and buy the coal described for 2009 and 2010.

2.    Liem Hazoumé's misinterpretation of the Contract led him, on behalf of Concept, to take the position with Traxys that there was no binding agreement for 2009 or 2010.

3.    Based on Traxys' October 17, 2008, letter exercising its option under the Special Provisions of the Contract, Concept was obligated to deliver the 2009 tonnage.

4.    Because Concept repudiated any obligation to deliver coal under the Contract after 2008 and was in breach of the Contract throughout 2009, Traxys was not required to give any notice of an election to take the 2010 tonnage.

5.    Concept never provided Traxys a schedule for delivery of the 2009 tonnage, a material breach of the Contract.

6.    Concept did not deliver coal to Traxys as promised for a portion of the 2008 tonnage, and all of 2009 and 2010 tonnage, in breach of the Contract.

7.    Traxys never breached or repudiated the Contract.

8.    Traxys was willing and able to take all of the tonnage provided for in the Contract, had it been delivered as promised by Concept.

9.    Traxys suffered damages as defined in the Contract as a result of Concept's breach of the Contract and as calculated by Traxys' expert witness, Seth Schwartz.

B.    ANALYSIS AND CONCLUSIONS OF LAW.

In May 2010, Traxys brought the current lawsuit, accusing Concept of breaching the Contract and seeking damages for the shortfalls in coal delivered in 2008, and for the failure to deliver any coal in 2009 and 2010. Traxys contends that Concept's breach throughout 2009 relieved Traxys of any obligation to give notice of its intent to purchase the 2010 tonnage.

Concept asserts that the failure to deliver coal in 2009 was Traxys' fault, because of its "George Strategy" of not responding to Concept's communications, which effectively repudiated the 2009 election, or at least excused Concept's nonperformance. It contends that its failure to provide delivery schedules as required by the Contract was an immaterial breach at worst. Concept further argues that, regardless of the status of the Contract in 2009, Traxys was not entitled to damages for 2010 tonnage, because Traxys failed to make an express election for that year.

This court has subject matter jurisdiction of the present action based on diversity of citizenship and amount in controversy. *See* 28 U.S.C.A § 1332 (West 2006 & Supp. 2011). By virtue of a valid choice-of-law provision, the Contract is governed by New York law. New York has adopted the Uniform Commercial Code, N.Y. U.C.C. (hereafter "UCC") § 1-101, which applies here because the Contract involved the sale of severed coal, UCC § 2-107(a).

To prevail on a breach of contract claim under New York law, the plaintiff must prove "'(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.'" *First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998) (quoting *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994)). Traxys has met its burden of proof.

1.    TERM OF CONTRACT.

The parties do not dispute that the agreement dated December 17, 2007, constituted a binding contract. They do dispute, however, the length and nature of the Contract's obligations. Concept characterizes the Contract as encompassing a one-year term. Traxys counters that the Contract contemplated a full three-year term, describing the Special Provisions clause as a mere "termination provision." (Pl.'s Post-Trial Mem. 15.)

"Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000) (citing *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978)). Individual contract provisions are not to be read in isolation, but instead the entire contract should be considered and all parts of it reconciled in an attempt to give effect to its general or primary purpose. *Terwilliger,* 206 F.3d at 245-46.

"The question of whether the language of a contract is clear or ambiguous is a question of law to be decided by the court." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000). Under New York law, a contract is ambiguous if it is susceptible of more than one interpretation, "'when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business.'" *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396-97 (2d Cir. 2009) (quoting *Revson v. Cinque & Cinque, P.C.,* 221 F.3d 59 (2d Cir. 2000)). In making a determination regarding the clarity of a contract, the court should look only within the four corners of the document, without reference to outside sources. *Id.*

In this instance, I find that the stated one-year term of the Contract contradicts the language of the Special Provisions clause so as to create an ambiguity as to the term of the agreement. When contract language is ambiguous, extrinsic evidence is relevant to the extent that it bears on the parties' objective manifestations of intent. *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 302 (S.D.N.Y. 1997).

I find that the proper interpretation of the Contract is that the parties contemplated a one-year term for the purchase and sale of coal, accompanied by

two successive one-year options. Although Traxys contends that the Special Provisions clause embodied only the parties' termination procedure, I disagree. The evidence — including the plain text of the contract, as well as the parties' statements during the contractual term — shows otherwise. *See Harley v. Indian Spring Land Co.*, 3 A.3d 992, 1005 (Conn. App. 2010) (whether an agreement is an option contract is a question of fact determined by the contract's language, the circumstances of its negotiation, and the conduct of the parties).

The Contract clearly specified a one-year term spanning January to December 2008. However, the Special Provisions clause also stated that "an additional two year term is an integral part of the contract." (Ex. 17.) The characterization of the two additional years as option periods serves to reconcile this language. Moreover, Traxys representatives used option language in describing the Contract, including the Traxys employee who drafted it. For example, an email from Janet Billups to Rod Savage referred to Traxys having a "call option on tonnage for 2009." (Ex. 37.)

For these reasons, I find that the Contract signed by the parties in December 2007 embodied an agreement for the purchase and sale of coal in 2008, and it additionally mutually bound the parties to two one-year reciprocal options for 2009 and 2010.

-14-

2.    2009 TONNAGE.

Concept now concedes that Traxys provided written notification on October 17, 2008, of its intent to purchase the 2009 tonnage under the Contract. I find that this written election was effective. *See Broadwall Am., Inc. v. Bram Will-El LLC*, 821 N.Y.S.2d 190, 193-94 (App. Div. 2006) (finding that an option contract ripens into an enforceable bilateral contract upon exercise of the option "according to its terms").[2]

Despite Traxys' election for the 2009 tonnage, Concept failed to provide delivery schedules for 2009 and failed to deliver coal for that year. Notwithstanding these facts, Concept contends that it is not liable for the 2009 tonnage. Concept argues that it was Traxys who was in fact responsible for Concept's lack of delivery. Concept argues that Traxys' strategy of stonewalling Concept's communications effectively rescinded the 2009 election. Alternatively, Concept argues that Traxys' actions excused Concept's nonperformance.

The UCC defines anticipatory repudiation as "an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." UCC § 2-610 cmt. 1. Under § 2-610, when a breach substantially impairs the value of a contract, the

---

[2]  The Special Provision provided that the parties were to seek to negotiate a "new contract" beginning November 1, 2008, but Concept does not claim that Traxys' election for the 2009 option was invalid because it occurred earlier, on October 17.

Case 1:10-cv-00029-JPJ-PMS   Document 109   Filed 08/25/11   Page 15 of 29   Pageid#: 2502

aggrieved party may at any time resort to legally available remedies, or alternatively, may suspend its own performance while negotiating or awaiting the performance of the other party. *Id.*

In late 2008 and early 2009, Concept was already delinquent on deliveries of coal. As I will discuss in further detail when addressing damages in this case, the record showed that Concept made some deliveries in early 2009, which addressed some of the shortfalls for 2008. At no point in 2009 did Concept deliver on its 2009 tonnage obligations. The failure to deliver in early 2009 constituted a material breach of the agreement and entitled Traxys to pursue remedies as an aggrieved party. Among those available remedies was for Traxys to await performance by Concept "for a commercially reasonable time," UCC § 2-610(1)(a), which it did.

Concept argues that Traxys' silence violated the parties' obligation to act in good faith. *See* UCC § 1-203 ("Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement."). However, the UCC provides that an aggrieved party awaiting performance does not violate the duty of good faith by remaining silent. UCC § 2-610 cmt. 4. ("Inaction and silence by the aggrieved party may leave the matter open[,] but it cannot be regarded as misleading the repudiating party.") The fact that Traxys' silence may have been in part strategic and sensitive to market considerations has no legal effect in this case.

Likewise, Traxys' silence and internal stratagem do not constitute a repudiation of the Contract. The UCC's definition of repudiation, while elastic, requires an "*overt* communication of intention." UCC § 2-610 cmt. 1 (emphasis added). Silence does not meet this definition, nor do negative internal communications. Although Traxys' employees may have discussed within their ranks the detrimental nature of the Contract, Traxys' outward communications with Concept consistently maintained the company's interest in purchasing the 2009 tonnage. (Exs. 35, 36, 99, 116, 118, 121-22, 129, 140-41, 144.) For these reasons, I find the argument that Traxys repudiated the Contract meritless.

Alternatively, Concept argues that Traxys so frustrated Concept's attempts at performance that Concept's non-delivery should be legally excused.

The UCC provides that "an action which renders performance impossible or demonstrates a clear determination not to continue with performance" can be considered a repudiation of the contract. UCC § 2-610 cmt. 1. It is not necessary that performance be made literally and utterly impossible, but only that the repudiating party's action reasonably indicates a rejection of the continuing obligation. UCC § 2-610 cmt. 2. As discussed above, Traxys' tactic of staying silent did not indicate rejection of the Contract. The issue remains, however, whether Traxys' refusal to communicate sufficiently frustrated Concept's ability to fulfill its obligations.

Concept argues that, because Traxys maintained agreements with the railroads that Concept did not have, only Traxys could set dates for railroad loading by which Concept could deliver the coal. Without Traxys' participation, Concept contends it could not set delivery schedules.[3]  Concept additionally contended that its failure to send the schedules was not a material breach, and regardless, the parties' prior course of performance was to mutually coordinate shipment.

Concept's argument that it could not establish delivery schedules is unpersuasive.  Whether or not the proposed dates would ultimately have been accepted does not affect Concept's ability or obligation to propose them.  Had Concept proposed dates, it would have demonstrated its willingness to perform and signified its intent to remedy its delinquency.  *See* UCC § 2-611.  However, without such action, I can only find that Concept remained in breach.

Concept also argues that failing to send delivery schedules did not constitute a material breach under the Contract.  For a breach of contract to be "material," it must go to the root or essence of the agreement between the parties, or to be one which touches the fundamental purpose of the contract and defeats the object of the parties in entering the contract.  *New Windsor Volunteer Ambulance Corps, Inc. v.*

---

[3] While Hazoumé claimed in an internal email that Janet Billups had agreed in a telephone call in March 2009 to provide delivery schedules to him, I do not credit this assertion, based on the contrary evidence.

Case 1:10-cv-00029-JPJ-PMS   Document 109   Filed 08/25/11   Page 18 of 29   Pageid#: 2505

*Meyers*, 442 F.3d 101, 117 (2d Cir. 2006). I credit the evidence that the shipment and timing of delivery was critical to the coal's ultimate use. Therefore, I find that providing delivery schedules was material to the Contract.

Furthermore, industry custom and the parties' course of dealing cannot override the plain language of the Contract. Although I may consider extrinsic evidence as to course of dealing, usage of trade, or course of performance for clarification purposes, I may not consider such evidence where it directly contradicts the plain language of the parties' written agreement. *See* UCC §§ 1-303, 2-202; *Anchin, Block & Anchin v. Pa. Coal & Coke Corp.*, 134 N.Y.S.2d 737, 739 (App. Div. 1954).

Here, Concept proposes that I should ignore the language of the Contract in favor of nebulous extrinsic evidence. The Contract plainly provided that Concept was obligated to notify Traxys of intended monthly delivery dates. Moreover, the extrinsic evidence Concept seeks to exploit is of limited value. Finally, I find that Traxys clearly advised Concept of its ability to accept any proposed delivery dates. (Exs. 35, 36.)

Accordingly, given the plain text of the Contract and Traxys' flexibility in accepting delivery dates, I find that Concept was under sufficient notice of its obligation to provide delivery schedules. By failing to do so and failing to deliver

the coal, Concept breached the Contract in 2009. Based on my findings of fact and law, I hold that Concept is liable for the 2009 tonnage.

Concept has counterclaimed in this case, contending that Traxys was liable for 2009 tonnage that Concept could have delivered had Traxys cooperated in arranging delivery dates. Because I find that it was Concept that breached the Contract, and not Traxys, I will enter judgment against Concept on its Counterclaim.

3.      2010 TONNAGE.

Having found Concept liable for breach of contract in 2009, I turn to the status of the Contract in 2010.

The parties agree that Traxys did not formally elect to purchase coal for 2010. However, they dispute the legal implication of this fact. Concept contends that it is not liable for 2010 because the Special Provisions clause required election for each year. Traxys counters that it was not required to elect for 2010.

As previously noted, in March of 2009 Liem Hazoumé took over management of the Contract for Concept.    At trial, Hazoumé provided testimony concerning his understanding of the Contract. This evidence showed that although Hazoumé may not have had full knowledge of the Contract's precise terms when he took over Concept's sales responsibilities, he was aware that Traxys and Concept had entered into a coal sales agreement in 2007. The evidence was

unclear as to when Hazoumé first actually reviewed the Contract. However, Hazoumé acknowledged being in receipt of the 2009 election letter, and eventually, the Contract itself.

Hazoumé's trial testimony repeatedly underscored his belief that there was no binding agreement for 2009. Hazoumé testified that during the spring of 2009, he actively sought to communicate with Traxys representatives in order to reopen negotiations and ultimately finalize an agreement for 2009. For example, he solicited input from colleagues within Concept and AM, requesting "remarks" on changes to contractual specifications and conditions to "bring [to] the table during negotiation[s]" (Ex. 32) and told AM colleagues in sales meetings that he was "very close to finaliz[ing] a deal with Traxys" in order to "start shipping." (Tr. 51-52, May 20, 2011, Part 2.)

Despite his desire at the time to sell the coal, Hazoumé testified that he believed he could not do so until he had obtained a "formalized" agreement "signed by both parties." (*Id.* at 33.) He characterized a "signed document by both parties" as being "absolutely" required. (*Id.* at 53.) Without this document, Hazoumé referred to the parties' status in 2009 as "negotiat[ing] . . . a new contract." (*Id*. at 35.)

I find that by denying the Contract's existence and refusing to authorize delivery of the coal, Hazoumé effectively repudiated the Contract, including the 2010 option to which Concept was bound.

Traxys converted its first option for 2009 into a binding sales contract when it exercised its option to buy at the high end of the price collar. At that point, Concept was obligated to perform for 2009. No further "formalization" or additional written or signed agreement was necessary. Because of Hazoumé's lack of understanding of this crucial point, Concept failed to perform. This failure resulted in Concept's breach through 2009.

Moreover, the ongoing breach throughout 2009 had legal consequence for the parties' status in 2010. A party in breach has no right to demand the fulfillment of a condition precedent. *Scott-Macon Sec., Inc. v. Zoltek Cos.*, No. 06-2711-cv, 2007 WL 2914873, at *3 (2d Cir. Oct. 4, 2007) (unpublished); *Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Reality, Inc.*, 522 N.Y.S.2d 292, 293 (App. Div. 1987). Once it becomes clear that the breaching party will not live up to the contract, the aggrieved party is relieved from the performance of futile acts. *Allbrand Disc. Liquors, Inc. v. Times Square Stores Corp.*, 399 N.Y.S.2d 700, 701 (App. Div. 1977). Given that Concept was in breach and repudiated the Contract throughout 2009, Concept may not now defend on the basis that Traxys was required to make a futile election on the 2010 tonnage.

The case of *Saewitz v. Epstein*, 6 F. Supp. 2d 151 (N.D.N.Y. 1998), applying New York law, is on point.  There the defendant granted an option to the plaintiff to purchase certain real estate, with the consideration paid for the option to be nonrefundable unless the defendant failed to deliver marketable title.  A defect in title — an unanticipated easement — was thereafter discovered, but the defendant advised the plaintiff that he must take the property subject to the easement.  The plaintiff then sued for return of his option money, having never given the defendant notice of the exercise of the option.  The court held that while the actual exercise of an option contract is the necessary performance of a condition precedent to the optionor's duty to perform, the doctrine of anticipatory repudiation "excus[ed] the optionee from [the] ceremonious performance of this condition."  *Id.* at 157.  *See also Hermanowski v. Acton Corp.*, 580 F. Supp. 140, 143 (E.D.N.Y. 1983) (holding that terminating plaintiff's unexercised stock option contract constituted anticipatory breach), *remanded on other grounds,* 729 F.2d 921 (2d Cir. 1984).

As long as Traxys was ready, willing, and able to perform its obligations, it was entitled to assume that an attempt to exercise the second option would have been a pointless endeavor.  As late as January 2010, Traxys continued to request delivery under the Contract, and I credit its evidence that it would have taken the coal for both years.

Up through the commencement of litigation, Concept has consistently maintained the position that no agreement existed past 2008. Given Concept's misinterpretation of the Contract and its insistence on renegotiating the terms for the option years before performing, I find that Concept breached the Contract in 2009, including the option it had granted for 2010. As a consequence, I find that Concept is liable for damages incurred in both years, regardless of the fact that Traxys did not formally elect for the 2010 tonnage.

4.   DAMAGES.

Pursuant to the exclusive remedy provision in the Contract, damages sustained by non-performance were to be calculated by the difference between the replacement or market price at the time of breach and the contract price.[4]   To determine the appropriate market price to be applied in calculating damages, the parties provided competing experts who prepared detailed reports and offered testimony at trial.

Traxys presented Seth Schwartz, President of Energy Ventures Analysis, Inc., an energy consulting firm. In order to determine market price, Schwartz used the price of similar sales reported in standard industry publications, coupled with

---

[4]   After Concept agreed that it was appropriate to apply the Contract's remedy provision, Traxys consented to withdraw Counts One and Three (calling for specific performance and damages pursuant to the UCC) as duplicative and those counts were dismissed. (Order, May 20, 2011.)

information he received regarding comparable purchases and sales made by Traxys and Concept over the relevant period. Schwartz calculated Traxys' damages at $42,696 for 2008, $800,367 for 2009 and at $3,324,697 for 2010, for a total sum of $4,167,760. (Ex. 174, Table 1.)[5]

Concept presented Robert Scott, President of Commonwealth Coal Marketing, a company providing consulting services for coal producers, geological forums, engineering companies, and financial institutions. Scott used a different trade publication, but his publication reported similar estimated market prices.[6] Scott calculated damages at $168,000 for 2009 and $2,032,000 for 2010, for a total sum of $2,200,000. (Def.'s Ex. 3, Tables 1, 2.)

Although the experts utilized similar trade publications and calculation methods to determine market price, their estimation of damages widely differed. The basis for this difference was the experts' respective opinions regarding the significance of ash percentage in influencing the Contract's price.

---

[5]  Schwartz alternatively calculated damages based on the actual cost of what he considered to be replacement or substitute coal purchased in June of 2010. (Ex. 174, Table 3.) However, since that calculation arrives at damages larger than the pure market-based calculation, I will accept the latter.

[6] While the publication used by Scott reported a market price somewhat higher for most months (approximately five to ten dollars per metric ton), the experts agreed that this difference was negligible and the publications could be considered as reporting similar prices during 2009 and 2010.

Case 1:10-cv-00029-JPJ-PMS   Document 109   Filed 08/25/11   Page 25 of 29   Pageid#: 2512

Ash is one specification in determining the quality of metallurgical coal. Generally, coal with a higher ash percentage is of a lower quality and is less valuable at market. In 2009 and 2010, the price of the Contract benefited Traxys for most months, granting it the option to purchase from Concept at a price appreciably below market.[7] In Scott's analysis, he opined that the Contract's advantageous price was due in large part to the fact that the Contract provided for coal with an ash specification that was two to three percent higher (and thus less valuable) than that of the average transactions reported in the trade publications. To account for the Contract's supposedly higher-than-market ash specification, Scott discounted the market price by approximately 22%.[8]

Pretrial, Traxys moved to exclude Scott's testimony, arguing that Scott's opinion was unreliable and thus inadmissible under Federal Rule of Evidence 702. I denied Traxys' motion as premature. *Traxys N. Am., LLC v. Concept Mining, Inc.*, No. 1:10CV00029, 2011 WL 1979385, at *2 (W.D. Va. May 16, 2011). Traxys also objected to the introduction at trial of Scott's latest report. While I will not strike Scott's testimony or report, I find that Scott overestimated the

---

[7] The only exceptions to this generality occurred during the market dip in early 2009, roughly March - May 2009.

[8] Specifically, Scott opined that in 2009, the market price of the Concept coal should have been approximately $100 per ton based on the market reports. However, Concept sold the coal for $78 per ton. Scott noted that the coal in the market reports had an ash percentage of eight or less, while the Contract coal specified ten percent.

importance of the ash specification, and I credit Schwartz with providing the more persuasive calculation of damages.

The experts concurred that the difference between market price and contract price in the trade of this coal could be dependent on a variety of considerations and product specifications other than ash percentage. For instance, Scott admitted that as a smaller producer in the coal market, Concept was potentially disadvantaged in its ability to command full market price for its product. (Tr. 121-23, May 24, 2011, Part 2.) Moreover, the evidence also tended to show that ash was not a specification that directed coal price to the extent that Scott assumed. Scott was unable to provide a convincing justification as to his heavy reliance on the ash as opposed to other explanations. Finally, the evidence did not show that the Contract's ash specification differed from that of the industry transactions to the degree Scott assumed. Thus, I reject Scott's assumption that the market price should have been discounted by 22% to account for the ash.

Both experts testified that market price is somewhat difficult to predict for this type of coal given the private nature of transactions, the limited availability of comparative data, and the thinly-traded nature of the market. Absent Scott's discount for the ash, however, the experts came to similar estimations of market price based on the available industry data. Because I find that Schwartz's

testimony provided a fair assessment of the industry information and incorporated all other available evidence, I credit his opinion regarding market price.

For the Contract price, Schwartz used the price elected in 2009 ($83 per ton) for both 2009 and 2010. Given the structure of the collar arrangement, I find that this was a reasonable assumption.[9]

Accordingly, I credit Schwartz's opinions and find that Traxys suffered damages in the amount of $42,696 for 2008, $800,367 for 2009 and $3,324,697 for 2010, for a total sum of $4,167,760.


## II

For the reasons stated, I find that Traxys is entitled to recover damages in the total principal amount of $4,167,760. Based upon Paragraph 4(b) of the General Terms and Conditions provision of the Contract, Traxys also claims prejudgment interest.[10] In addition, the parties previously agreed to defer until after a decision on the merits any claims for "Legal Costs" as provided for in Paragraph 1(a) of the General Terms and Conditions. A separate order will be entered setting forth the

---

[9] There is a question as to whether the collar price for 2010 should have been $88, rather than $83, as assumed by Schwartz. While an argument may be made that the parties intended that the 2010 collar prices would move five dollars above the 2009 collar prices, I find that the plain language of the Contract provides that the high end of the collar price for both 2009 and 2010 was $83.

[10] Schwartz testified at trial as to a hypothetical calculation of prejudgment interest, but noted that it depended upon the damages as ultimately determined by the court.

procedure for the court's determination of the claims for prejudgment interest and Legal Costs.  Following that determination, final judgment will be entered in the case.

DATED:   August 25, 2011

/s/ James P. Jones
United States District Judge